Cameron **HENDERSON,** Cameron Henderson Oil Co., Inc., C.H.O. Real Estate Holdings, Inc., Star Service and Petroleum Co., Atlantic Western Corporation, Sure Shop, Inc., and Quik Mart, Inc., Appellants (Defendants Below),

v.

**SNEATH OIL COMPANY, INC.,** Appellee (Plaintiff Below).

No. 11A04–9307–CV–261.

Court of Appeals of Indiana, Fourth District.

Aug. 4, 1994.

William G. Brown, Brown & Somheil, Brazil, for appellants.

Stephen L. Trueblood, James B. Organ, Trueblood Law Firm, Terre Haute, for appellee.

RATLIFF, Senior Judge.

## STATEMENT OF THE CASE

Cameron Henderson, Star Service and Petroleum Company, and Atlantic Western Corporation appeal the trial court's judgment of their liability for payment of a promissory note signed by Henderson as president of Star. We affirm the judgment but remand for correction of the judgment as to form.

## ISSUES

I. Did the trial court err as to the amount of judgment in that it failed to include credit due Star in another account?

II. Was judgment of Henderson's and Atlantic Western Corporation's liability contrary to law in that the trial court improperly permitted piercing of the corporate veil?

III. Does the judgment fail to comply with Ind.Trial Rule 58's specific requirements for the content of a judgment?

## FACTS

Harry and Rosetta Sneath operate Sneath Oil Company, Inc., an independent oil jobber in Brazil, Indiana. Star Service and Petroleum began purchasing oil products from Sneath for its Indiana convenience store outlets in December of 1988. In the spring of 1989, Sneath began experiencing collection difficulties with the Star account. Checks from Star, signed by President Henderson, were dishonored by its bank for a variety of reasons, including insufficient funds, stopped payment, and a closed account. At the end of June, 1989, Sneath wrote Star summarizing the balance then due—a total of $79,561.17. To pursue payment, Mr. and Mrs. Sneath travelled to Corsicana, Texas, where they located the Star office at 800 North Main. There were "no signs up whatsoever indicating what company was operating or who was there." R. at 188. The company accountant indicated Henderson was out of

town. The next morning they found Henderson at his home. Henderson signed a promissory note to Sneath, as president of Star, for $79,561.17. The note provided for monthly payments of $10,000, and for interest and attorney fees of at least ten percent on any uncollected deficiencies. During the conversation with the Sneaths at this time, Henderson stated that if he (Henderson) had a problem with one of his corporation's finances, he could simply form another one— and he had done that many times. Henderson also told Sneath he had filed corporate bankruptcy before.

The first monthly payment was due July 15, 1989. Having received no payment, on July 20, 1989, Mr. Sneath travelled to the issuing bank in Cape Girardeau with a $15,-945.87 check previously returned for insufficient funds and succeeded in cashing it. This was applied to the note. On July 22nd, Sneath received a check from Cameron Henderson Oil Co., Inc. (of which Henderson was an incorporator and initial director) for $10,000. This would have been applied to the note but was returned by the bank for insufficient funds. Purchases for fuel after the signing of the note were made on an open fuel account. Thus, Sneath maintained two accounts for Star: one for payment on the note and one for fuel purchases. Fuel purchases were required to be paid in advance, and in September 1989 Star had a credit of a little more than $1,900.00 on the fuel account.

Star failed to make further payments as required under the promissory note and made no payments after October 1989. The balance at the February 15, 1990, maturity date was $52,928.41. On December 6, 1989, Sneath sued Star, also naming Atlantic Western Corporation on the theory that it had an interlocking board of directors and unity of concept and purpose with Star. Sneath's amended complaint alleged that Star had divested its assets and begun doing business as Atlantic. Sneath further amended his complaint to add Henderson as a defendant as well as four other corporations, alleging that the various corporations were operated by Henderson in such a way that they were,

in fact, one legal entity and were all liable to Sneath.[1] A bench trial was conducted on December 21, 1992.

Henderson was Star's president and only director; Star's 1989 annual registration showed its principal place of business as 800 North Main Street, Corsicana, Texas. Henderson was also Atlantic Western Corporation's president and only director; its 1989 annual registration stated its principal place of business was 800 North Main Street, Corsicana. Wanda Slater notarized both registration forms and was listed as secretary of Atlantic. Wanda Slater said in her deposition that she "work[ed] for Cameron Henderson." R. at 244.

According to Henderson's answers to interrogatories admitted to the record, Atlantic was incorporated July 20, 1989, in Texas. Star then sold property and equipment to Atlantic Western for $250,000. Atlantic assumed a $112,000 note and paid the balance in cash.

Sneath's bookkeeper produced records of both the Star fuel account and the promissory note account. She also provided calculation of the accrual of interest (at eighteen percent, as stated in the note) since its February 15, 1990 maturity date and the ten percent attorney fee expense.

Six witnesses testified to having supplied oil products to Star during late 1988 and in 1989 and not being paid. Two of these witnesses had received checks for payment on the Star account from another Henderson company. Another of these witnesses testified that in the summer of 1989, the business where his company previously delivered petroleum for Star "changed their name" to Atlantic. (R. 376).

On March 22, 1993, the trial court awarded judgment against Star Service and Petroleum Co., Atlantic Western Corporation, and Henderson in the sum of $52,928.41 principal, $29,550.65 interest, and $8,247.90 attorney fees—a total of $90,726.97 dollars and costs of the action.

1. In addition to the promissory note, the complaint asserted causes of action for fraud, quantum meruit, civil action by crime victim, contract and account.

## DISCUSSION AND DECISION

### I. AMOUNT OF JUDGMENT

■ Henderson (henceforth used to refer to arguments of appellants Cameron D. Henderson, Star Service and Petroleum Company, and Atlantic Western Corporation collectively) claims the amount of the trial court judgment is "contrary to the evidence." Appellants' Brief at 15, 16. Henderson's argument centers on the bookkeeper's testimony that the cash basis fuel account had a credit of more than $1,900, which he asserts should have been set off against the amount due on the note.

■ Unless a trial court has abused its discretion in exercising its authority, its judgment will not be disturbed. *Carlson v. State ex rel Stodola* (1966), 247 Ind. 631, 220 N.E.2d 532. There is an abuse of discretion by the trial court when its decision is clearly against the logic and effect of the facts and circumstances before the court. *Myers v. Myers* (1990), Ind., 560 N.E.2d 39. Thus, a "reviewing court must determine whether the evidence adduced at trial can serve as a rational basis for the court's decision"—but without reweighing the evidence. *Eyler v. Eyler* (1986), Ind., 492 N.E.2d 1071, 1075. "[W]e look to the evidence most favorable to the judgment and all reasonable inferences to be drawn therefrom, and will affirm if there is substantial evidence of probative value to support the judgment." *Beck v. Mason* (1991), Ind.App., 580 N.E.2d 290, 291.

Henderson cites *Fox v. Wallace* (1926), 88 Ind.App. 235, 151 N.E. 835 and *Hunnicutt v. Boughner* (1967), 141 Ind.App. 669, 231 N.E.2d 159 for the fundamental rule that a judgment should conform to the evidence adduced at trial. In *Hunnicutt, supra,* a "total lack of evidence" as to the existence of a duty precluded a finding of negligence. *Fox, supra,* held a judgment for damages impermissible in a suit solely seeking specific performance. Neither case is apposite to the facts before us.

Henderson's answer admitted execution of the Star promissory note and that its balance on October 30, 1989, was $51,115.72. The note specified twelve percent annual interest until the February 15, 1990, maturity date.

Thereafter, interest was to be at eighteen percent, and attorney fees of no less than ten percent of principal and interest were specified in the event of collection action. The Sneath bookkeeper provided a calculation of the note balance at maturity—$52,928.41. With addition of the eighteen percent interest and collection expense, the exhibit showed a total of $88,107.01 owing on the note at the time of trial. The amount of judgment, $90,726.97, includes the additional interest and collection expense computed to the date of judgment.

In addition to this mathematical evidence supporting the judgment, the bookkeeper's testimony, Mr. Sneath's testimony and the trial exhibits all indicate Star had two separate accounts with Sneath—the note account (for fuel purchases on which payment was owing at the time the promissory note was executed), and a fuel account (for prepaid purchases *after* the date of the note). The fuel account allowed Star to purchase fuel on a cash basis. According to the bookkeeper, various adjustments occurred in the fuel account because of the prepayment requirement: deductions were made for wire charges, and the amounts to be delivered did not "always come out exactly even." R. at 152. Generally, there "was just a little bit left over from each order of fuel." R. at 182. Therefore, a credit accrued in this account which was unliquidated at the time of trial. No evidence in the record indicates any agreement between the parties regarding application of any pending credit in the fuel account against the amount due on the note. In fact, "we [Sneath] had no idea what they wanted" done with the credit balance. R. at 176. "Anything that was wired in for fuel, it stayed with just the fuel account." R. at 181.

Henderson neither initiated any cross action under Ind.Trial Rule 13 with a counterclaim for credit due him by Sneath nor moved to amend his pleadings under T.R. 15(C) to conform to the evidence at trial. While it would have been within the trial court's discretion to take both accounts into consideration in arriving at the amount of judgment on the promissory note, sufficient evidence of probative value does support the

amount determined by the trial court to be due on the promissory note claim litigated.

Henderson further argues that because the attorney fee expense was calculated based upon the amount due only on the promissory note, without taking into account the credit in the other account, the attorney fee amount is also incorrect. Appellant's Brief at 15–16.[2] Because the amount of the judgment is sustained by sufficient probative evidence, Henderson's argument on the attorney fee award also fails.

## II. LIABILITY OF HENDERSON AND ATLANTIC WESTERN

■ Henderson asserts judgment against Cameron Henderson and Atlantic for liability on Star's promissory note is contrary to law. He argues that the evidence merely shows Sneath made a bad business decision—to deal with Star—and no basis for imposition of liability upon Henderson or Atlantic.

■ Our responsibility in appellate review is not to consider witness credibility or to reweigh evidence; rather, we focus upon evidence most favorable to the judgment, together with all reasonable inferences. *Wells v. Auberry* (1985), Ind.App., 476 N.E.2d 869, 873. Only when that evidence is without conflict and leads to but one conclusion, which is contrary to the conclusion reached by the trial court, shall we find the trial court's decision contrary to law. *Id.*

Henderson cites *Extra Energy Coal Co. v. Diamond Energy* (1984), Ind.App., 467 N.E.2d 439, 441 for the reluctance of Indiana courts to disregard the corporate entity— while conceding their ability to do so in order to protect innocent third parties from fraud or injustice. *Extra* upheld a trial court finding of "no evidence of fraud or misrepresentation" after two corporations alleged to be jointly liable presented evidence of 1) incorporation at different times for separate and distinct purposes; 2) separate identification for each on the business sign outside the building; 3) separate offices, telephone numbers, stationery and business cards for each

corporation; and 4) separate bank accounts and corporate general ledgers for the recording of receipts and expenditures. Henderson presented no evidence in this regard concerning the corporations. The only corporate evidence was submitted by Sneath and, consequently, is uncontradicted.

Henderson further refers us to *Feucht v. Real Silk Hosiery Mills, Inc.* (1938), 105 Ind.App. 405, 12 N.E.2d 1019. We revisited *Feucht* in *Clarke Auto Co., Inc. v. Fyffe* (1954), 124 Ind.App. 222, 116 N.E.2d 532, and more recently in *Burger Man, Inc. v. Jordan Paper Products, Inc.* (1976), 170 Ind.App. 295, 352 N.E.2d 821. In the latter, we summarized that piercing the corporate veil was not limited to cases "where, to prevent fraud or injustice, it is necessary to disregard the fiction of distinct corporate existence, and to hold as a matter of equity that such separate legal entity does not exist" but was also available "in cases involving the rights of third persons ... in its application *to the prevention of fraud and injustice.*" *Id.* 352 N.E.2d at 834. *Burger Man* noted "there is no one talismanic factor that a court can find to exist which will with impunity justify it in piercing the corporate veil" to hold related companies jointly liable, and said "a careful review of the entire relationship" must precede piercing the corporate veil." *Id.* In *Stacey–Rand, Inc. v. J.J. Holman, Inc.* (1988), Ind.App., 527 N.E.2d 726, we expanded our review to include the relationship between the directors and officers of various corporate entities to determine whether the equitable action of piercing the corporate veil was warranted. *Id.* at 728. Most recently, we again noted Indiana courts would disregard corporate entity to protect innocent third parties from injustice. *Gurnik v. Lee* (1992), Ind.App., 587 N.E.2d 706, 710. The party "seeking to pierce the corporate veil bears the burden of establishing that the corporation was so ignored, controlled, or manipulated that it was merely the instrumentality of another, and that the misuse of

**2.** In his reply brief, Henderson questions for the first time the sufficiency of the evidence regarding attorney fees, claiming lack of expert testimony to support attorney fees *Berkemeier v. Rush-* *ville Nat'l Bank* (1982), 438 N.E.2d 1054. This issue was not raised in Henderson's brief and, hence, is waived. *Cargill, Inc. v. Bunker Hill Elevator Co.* (1987), Ind.App., 505 N.E.2d 75.

the corporate form would constitute a fraud or promote injustice." *Id.*

The record discloses Henderson was president and sole director of both Star and Atlantic. In 1989, both Star and Atlantic designated their principal place of business as 800 North Main Street, Corsicana, and both were engaged in the business of retailing petroleum. Henderson told the Sneaths, at the time he signed the promissory note as president of Star, that he could simply form another corporation if he encountered financial difficulties with one corporation; he stated in his answers to interrogatories that Atlantic was incorporated shortly after the signing of the note and paid Star $250,000 for the transfer of property and equipment to Atlantic. Several witnesses, whose testimony is undisputed, described business activities of Henderson suggesting his "misuse of the corporate form." *Id.*

Upon review of the record, it cannot be said that the evidence presented leads solely to a result different from that reached by the trial court. Thus, the judgment against Cameron and Atlantic is not contrary to law.

### III. COMPLIANCE WITH TRIAL RULE 58

■ Henderson claims the trial court's judgment fails to comply with Ind.Trial Rule 58(B) by omitting certain required information. The judgment reads:

> IT IS THEREFORE ORDERED, that Plaintiff, Sneath Oil Co., Inc., be and is hereby awarded judgment of and against Defendants, Star Service and Petroleum Co., Atlantic Western Corporation, and Cameron D. Henderson in the sum of $52,-

928.41 principal, $29,550.65 interest, $8,247.90 attorney fees or a total of $90,-726.96 dollars and the cost of this action.

■ The sufficiency of a judgment "is to be tested by its substance rather than its form." 46 Am.Jur.2d *Judgments* § 64 (1969). "[I]t must show distinctly, and not inferentially, that the rights of the parties in litigation have been finally adjudicated, and that the matters in the record have finally been disposed of in favor of one of the litigants." *Id.* The trial court's judgment specifies which of the named defendants were found liable. Critical to a money judgment is that it be a certain and definite statement of the amount due. *United Farm Bureau Mutual Ins. Co. v. Ira* (1991), Ind.App., 577 N.E.2d 588. That the trial court's judgment meets this test is apparent not only from the face of the judgment but also from Henderson's challenge to the exact amount of the judgment.

However, according to T.R. 58(B), effective January 1, 1991, a judgment *shall* contain certain elements.[3] The rationale for such specifically required content is explained by reading T.R. 58(B) in conjunction with court records management rules. *See* T.R. 77 and Ind.Administrative Rule 7. Cases will no longer be on file in the office of the court clerk but will be preserved only by the judgment entered under T.R. 58. William F. Harvey, *Indiana Practice,* § 58.3 at 26–27 (1991).

Henderson's argument is supported only by citation to T.R. 58(B). We find no cases discussing noncompliance with the mandatory rule. However, Sneath aptly notes that Henderson fails to allege any prejudice re-

---

**3.** T.R. 58(B) requires a judgment contain:

(1) A statement of the submission indicating whether the submission was to a jury or to the Court; whether the submission was upon default, motion, cross-claim, counterclaim or third-party complaint; and if the submission was to less than all issues or parties, such other matters as may be necessary to clearly state what issue is resolved or what party is bound by the judgment.

(2) A statement of the appearances at the submission indicating whether the parties appeared in person, by counsel, or both; whether there was a failure to appear after notice; and whether the submission was conducted by telephone conference.

(3) At the court's discretion and in such detail as it may deem appropriate, a statement of the court's jurisdiction over the parties and action and of the issues considered in sufficient particularity to enable any party affected by the judgment to raise in another action the defenses of merger, bar, or claim or issue preclusion.

(4) A statement in imperative form which clearly and concisely sets forth the relief granted, any alteration of status, any right declared, or any act to be done or not done.

(5) The date of the judgment and the signature of the judge.

sulting from the form of the judgment and that "to constitute sufficient basis for reversal of a judgment, trial court error must be such that it impinges upon and prejudices a substantial right...." *FMC Corp. v. Brown* (1990), Ind., 551 N.E.2d 444, 447. Accordingly, reversal is not warranted here. However, because T.R.58(B) requires specific elements be contained in a judgment, and because that requirement clearly comports with the need for certain information to be maintained for future reference, we remand for the trial court to prepare, sign and enter its judgment consistent with the rule.

CHEZEM and NAJAM, JJ., concur.

